COURT OF APPEALS

                                       SECOND DISTRICT OF TEXAS

                                                   FORT WORTH

 

 

                                       NO.  2-08-117-CR

 

 

MARK DERICHSWEILER                                                        APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 362ND DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

                                       I.  Introduction

The
primary issue we address in this appeal is whether the trial court erred by
denying Appellant Mark Derichsweiler=s motion
to suppress.  Because, as set forth
below, police lacked reasonable suspicion to stop Derichsweiler, we hold that
the trial court did err by denying Derichsweiler=s motion
to suppress. Accordingly, we will reverse the trial court=s
judgment and remand this case to the trial court.








                   II.  Factual and Procedural
Background

A grand
jury indicted Derichsweiler for driving while intoxicated.  The indictment alleged two prior DWI
convictions and two enhancement convictions. 


Derichsweiler
filed a motion to suppress all evidence arising from his initial stop, arguing
that the arresting officer lacked reasonable suspicion to justify the
stop.  Three witnesses testified at the
suppression hearing:  Joe Holden, Joanna
Holden, and Lewisville Police Officer Wardel Carraby.  








Joe
testified that at approximately 8:00 on the evening of December 31, 2006, he
and Joanna ordered food from a McDonald=s
restaurant drive-through; Joanna was driving. 
While they waited for their food, Joanna said, AI don=t know
what=s wrong
with the guy in the car beside us,@ but Joe
could not see the vehicle or the driver. 
The same vehicle then pulled up in front of the Holdens= car,
and the vehicle=s driverCDerichsweilerCstared
at them, grinning, for about fifteen seconds. 
Derichsweiler then drove around the McDonald=s
building and stopped behind and to the left of the Holdens=
car.  Again, Derichsweiler stared and
grinned at the Holdens for fifteen to twenty seconds.  The Holdens became Aextremely
concerned@; they did not know the driver=s
motive, whether he Awas out to get us or if there
was a robbery in progress.@  Joe called 911.  He identified himself to the operator, told
the operator that Athere was some suspicious
behavior with the vehicle,@
described the vehicle, and recited its license number.

Meanwhile,
Derichsweiler drove to the adjacent Wal-Mart parking lot, where he appeared to
be Adoing
the same thing with another vehicle that was parked.@  Joe lost track of Derichsweiler=s
vehicle, and then patrol cars arrived Afrom
everywhere.@ 
Before Joe and Joanna left the scene, a police officer spoke to them;
they provided the officer with their contact information.  On cross-examination, Joe conceded that he
did not see Derichsweiler commit any crimes or make any threatening
gestures.  

Joanna
testified that Derichsweiler=s
conduct, A[j]ust kind of grinning and just
being stopped beside us while we=re
stopped at a drive-through and looking straight at us[,] just didn=t seem
normal@ to her.  When Derichsweiler stopped behind the
Holdens, Joanna became afraid and told Joe to call 911.  She testified that she watched Derichsweiler
drive to the Wal-Mart parking lot: AHe=s
pulling into parking spots and staying there for about the same amount of time
that he was observing us, and then pulling out and moving into different
parking spots, and kind of closer to the door.@  Joanna also testified that she did not see
Derichsweiler commit any crimes and that the only gesture she saw him make was
grinning.  Nonetheless, she claimed that
she Afelt
stalked.@








Officer
Carraby, who had about one year=s
experience as a peace officer at the time of the incident, testified that he
received a dispatch concerning a suspicious vehicle.  The dispatcher gave him the vehicle=s
description and license number and identified Joe Holden as the person who had
reported the vehicle.  Officer Carraby
and another officer in a different patrol car responded to the dispatch and
drove to the Wal-Mart parking lot. 
Officer Carraby saw Derichsweiler=s
vehicle driving around the Wal-Mart parking lot and pulling into a parking spot
in the Wal-Mart lot.  Officer Carraby and
the other officer pulled up behind Derichsweiler=s
vehicle, another officer drove up in a third patrol car, and the three vehicles
Asurrounded@
Derichsweiler=s vehicle, blocking it in.  Officer Carraby testified that, at that
point, Derichsweiler could not have driven away if he had wanted to and that
Officer Carraby would not have let Derichsweiler leave until he could talk to
Derichsweiler to find out what was going on. 

 Officer Carraby got out and approached
Derichsweiler=s vehicle.  When Derichsweiler rolled down his window,
Officer Carraby smelled a strong odor of alcoholic beverages coming from the
vehicle, and he began to investigate the case as a DWI.








The
trial court denied Derichsweiler=s motion
to suppress.  After trial, the trial
court made findings of fact and conclusions of law regarding Derichsweiler=s stop,
concluding that Officer Carraby had reasonable suspicion to detain
Derichsweiler Ato investigate his suspicious
behavior and possible involvement in criminal activity@ and
that the case was Aalmost on point@ with Bobo
v. State, 843 S.W.2d 572, 575 (Tex. Crim. App. 1992).

The case
was tried to a jury.  Both Joe and Joanna
testified at trial, and their testimony was essentially identical to their
testimony at the suppression hearing. 
Officer Carraby=s testimony was also consistent
with his suppression-hearing testimony, but he added that he parked his patrol
car Ain such
a manner to block [Derichsweiler=s]
vehicle in.@ 
He testified that Derichsweiler was not free to leave. 

The jury
found Derichsweiler guilty of DWI, found the sentencing enhancement allegations
to be true, and assessed punishment at forty-seven years in prison.  The trial court sentenced him accordingly.

                        III.  Reasonable Suspicion for
Stop

In his
first point, Derichsweiler argues that the trial court erred by denying his
motion to suppress because Officer Carraby lacked reasonable suspicion to stop
him.

                                    A.  Standard of Review








We
review a trial court=s ruling on a motion to suppress
evidence under a bifurcated standard of review. 
Amador v. State, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); Guzman
v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court=s
decision, we do not engage in our own factual review.  Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990); Best v. State, 118 S.W.3d 857, 861 (Tex. App.CFort
Worth 2003, no pet.).  The trial judge is
the sole trier of fact and judge of the credibility of the witnesses and the
weight to be given their testimony.  Wiede
v. State, 214 S.W.3d 17, 24B25 (Tex.
Crim. App. 2007); State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App.
2000), modified on other grounds by State v. Cullen, 195 S.W.3d 696
(Tex. Crim. App. 2006).  Therefore, we
give almost total deference to the trial court=s rulings
on (1) questions of historical fact, even if the trial court=s
determination of those facts was not based on an evaluation of credibility and
demeanor, and (2) application‑of‑law‑to‑fact questions
that turn on an evaluation of credibility and demeanor.  Amador, 221 S.W.3d at 673; Montanez
v. State, 195 S.W.3d 101, 108B09 (Tex.
Crim. App. 2006); Johnson v. State, 68 S.W.3d 644, 652B53 (Tex.
Crim. App. 2002).  But when
application-of-law-to-fact questions do not turn on the credibility and
demeanor of the witnesses, we review the trial court=s
rulings on those questions de novo.  Amador,
221 S.W.3d at 673; Estrada v. State, 154 S.W.3d 604, 607 (Tex. Crim.
App. 2005); Johnson, 68 S.W.3d at 652B53.








Stated
another way, when reviewing the trial court=s ruling
on a motion to suppress, we must view the evidence in the light most favorable
to the trial court=s ruling.  Wiede, 214 S.W.3d at 24; State v.
Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).  When the trial court makes explicit fact
findings, we determine whether the evidence, when viewed in the light most
favorable to the trial court=s
ruling, supports those fact findings.  Kelly,
204 S.W.3d at 818B19.  We then review the trial court=s legal
ruling de novo unless its explicit fact findings that are supported by the
record are also dispositive of the legal ruling.  Id. at 819.








When
determining whether a trial court=s
decision is supported by the record, we generally consider only evidence
adduced at the suppression hearing because the ruling was based on it rather
than evidence introduced later.  See
Gutierrez v. State, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); Rachal
v. State, 917 S.W.2d 799, 809 (Tex. Crim. App.), cert. denied, 519
U.S. 1043 (1996).  But this general rule
is inapplicable when the parties consensually relitigated the suppression issue
during trial on the merits.  Gutierrez,
221 S.W.3d at 687; Rachal, 917 S.W.2d at 799; Beall v. State, 237
S.W.3d 841, 846 (Tex. App.CFort
Worth 2007, no pet.).  If the State
raised the issue at trial either without objection or with subsequent
participation in the inquiry by the defense, the defendant is deemed to have
elected to re‑open the evidence, and we may consider the relevant trial
testimony in our review.  Rachal,
917 S.W.2d at 799.

                       B.  The Law of Detentions and Terry Stops[1]

The
Fourth Amendment protects against unreasonable searches and seizures.  U.S. Const. amend. IV.; Wiede, 214
S.W.3d at 24.  To suppress evidence
because of an alleged Fourth Amendment violation, the defendant bears the
initial burden of producing evidence that rebuts the presumption of proper
police conduct.  Amador, 221
S.W.3d at 672.  A defendant satisfies
this burden by establishing that a search or seizure occurred without a
warrant.  Id.  Once the defendant has made this showing, the
burden of proof shifts to the State, which must then establish that the government
agent conducted the search or seizure pursuant to a warrant or that the agent
acted reasonably.  Id.; Torres
v. State, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); Ford v. State,
158 S.W.3d 488, 492 (Tex. Crim. App. 2005).








A
detention, as opposed to an arrest, may be justified on less than probable
cause if a person is reasonably suspected of criminal activity based on
specific, articulable facts.  Terry,
392 U.S. at 22, 88 S. Ct. at 1880; Carmouche v. State, 10 S.W.3d 323,
328 (Tex. Crim. App. 2000).  An officer
conducts a lawful temporary stop or detention when he or she has reasonable
suspicion to believe that an individual is violating the law.  Ford, 158 S.W.3d at 492.  Reasonable suspicion exists when, based on
the totality of the circumstances, the officer has specific, articulable facts
that when combined with rational inferences from those facts, would lead him to
reasonably conclude that a particular person is, has been, or soon will be
engaged in criminal activity.  Id.
at 492B93.  This is an objective standard that disregards
any subjective intent of the officer making the detention and looks solely to
whether an objective basis for the detention exists.   Id.
at 492.  We look at only those facts
known to the officer at the inception of the detention.  State v. Griffey, 241 S.W.3d 700, 704
(Tex. App.CAustin 2007, pet. ref=d).








AThe
factual basis for stopping a vehicle need not arise from the officer=s
personal observation, but may be supplied by information acquired from another
person.@  Brother v. State, 166 S.W.3d 255,
257  (Tex. Crim. App. 2005), cert.
denied, 546 U.S. 1150 (2006); see Bobo, 843 S.W.2d at 575.
Reasonable suspicion may be established based on information given to police
officers by citizen informants, provided the facts are adequately corroborated
by the officer.  Brother, 166
S.W.3d at 258B59.  Corroboration does not mean that the officer
must personally observe the conduct giving rise to reasonable suspicion, but
simply requires the officer to confirm enough facts to reasonably conclude that
the informant=s information is reliable.  Id. at 259 n.5; see also Alabama v.
White, 496 U.S. 325, 330B31, 110
S. Ct. 2412, 2416B17 (1990).

                   C.  Officer Carraby Lacked Reasonable Suspicion








Before
turning to the question of whether Officer Carraby had reasonable suspicion to
stop Derichsweiler, we must consider the State=s
argument that Derichsweiler was not Adetained@ when
the officers surrounded his vehicle with their patrol cars, blocking him from
leaving.  The State argues that no stop
or detention occurred until after Officer Carraby approached Derichsweiler=s
vehicle and detected the odor of alcoholic beverages emanating from the
vehicle.  The State cites State v.
Garcia-Cantu, 253 S.W.3d 236, 244B49 (Tex.
Crim. App. 2008), and that case=s list
of factors that help determine whether a stop occurred.  One of the Garcia-Cantu factors is
whether the police officer Aboxed in@ the
suspect=s
vehicle.  Id. at 246.  The State concedes that Officer Carraby
parked his patrol car in a way that blocked Derichsweiler=s
vehicle, but it argues that a reasonable person would not conclude from this
fact that he was being detained and that A[f]ar
more likely, a reasonable and innocent person would believe something else was
going on at the location.@ 
But at the suppression hearing, Officer Carraby testified that his and
two other patrol cars Asurrounded@
Derichsweiler=s vehicle and that Derichsweiler
could not have left if he had wanted. 
And at trial, Officer Carraby testified that he blocked Derichsweiler=s
vehicle from leaving and that Derichsweiler, in fact, was not free to leave.[2]  Joe testified at the suppression hearing that
after he lost sight of Derichsweiler=s
vehicle, the next thing he saw was A[p]olice
cars [coming] from everywhere,@ and
Joanna testified that she saw three patrol cars Aswooping
in@ from
all angles and parking all around Derichsweiler=s
vehicle such that he could not move.

When
that testimony is added to the analysis, it seems impossible for a reasonable
person to conclude that he was not being detained.  And as the Garcia-Cantu court noted, Aboxing
in@ is a
significant factor in determining whether a detention occurred; A[m]ost
courts have held that when an officer >boxes in= a car
to prevent its voluntary departure, this conduct constitutes a Fourth Amendment
seizure.@  Id. n.44 (collecting cases).  We therefore reject the State=s
argument that Officer Carraby did not stop or detain Derichsweiler until after
the officer smelled the odor of alcoholic beverages emanating from
Derichsweiler=s vehicle.  We now turn to the merits of Derichsweiler=s
argument.













A proper
analysis begins by looking at only those facts known to Officer Carraby at the
inception of his detention of Derichsweiler. 
Officer Carraby knew that a citizen informant had reported that a
suspicious male in a small gray car with license plate number 971-MPM was
driving or circling around the public parking lot of McDonald=s and
Wal-Mart at 8:00 one evening.[3]  At the suppression hearing, Officer Carraby
explained that when he responded to the dispatch, he did not know what specific
activity gave rise to the 911 caller=s
suspicion.  He said that other than the
fact that the vehicle was circling the parking lot, he did not receive any
other information that the driver was committing any Aother
criminal activity.@ 
Officer Carraby explained that, based on his training and experience, he
believed that Athere was possible criminal
activity afoot@ because Ait=s not
normal for vehicles to drive around the parking lot at 8:00 o=clock at
night.@  Joe could not recall how he explained to the
911 operator what the vehicle had been doing and said that A[i]t was
a pretty quick phone call.@

This is
the sum total of the information known to Officer CarrabyCboth
from dispatch and from the officer=s
independent observationsCwhen the officers detained
Derichsweiler by Ablocking in@ his
vehicle with three police vehicles.  No
evidence exists in the record that any cooperating officer knew any additional
facts other than those testified to by the Holdens and Officer Carraby.  See State v. Jennings, 958
S.W.2d 930, 933 (Tex. App.CAmarillo
1997, no pet.) (noting that a reviewing court Amust
proceed cautiously when it appears that the detaining officer acted upon nothing
other than a radio dispatch@); cf.
Fearance v. State, 771 S.W.2d 486, 509 (Tex. Crim. App. 1988), cert.
denied, 492 U.S. 927, 109 S. Ct. 3266 (1989) (stating that trial court
could rely on the sum of the information known to the cooperating officers at
the time of the incident).








The
trial court relied upon Bobo v. State in its findings of fact,
concluding that the factual situation in Bobo is Aalmost
on point with the case at bar.@  See 843 S.W.2d 574B75.  In Bobo, an off-duty police officer
acting as a townhome complex security guard was notified that a resident of a
townhome complex Ahad observed two suspicious
persons in an area where they should not be.@  Id. at 575 [emphasis added].  The court of criminal appeals held that the
citizen=s report
of suspicious persons around several townhomes, the observation of two
individuals matching the descriptions provided by the citizen, and the officer=s
fifteen years= experience provided the officer
with reasonable, articulable suspicion that the individuals were connected with
criminal activity.  Id.








The
salient difference between the facts in Bobo and the present facts is
that in Bobo, the townhouse security guardCan
off-duty police officer with fifteen years= law
enforcement experienceCwas notified that a townhome
resident reported Asuspicious persons@ in an
area of the townhome complex Awhere
they should not be.@  See id.  [emphasis added]  Consequently, in Bobo, the officerCwhile he
was on duty as the townhome security guardCobtained
information from a townhome resident that gave rise to reasonable, articulable
suspicion that the two suspicious individuals were connected with criminal
activity, i.e., criminal trespass.  See
Tex. Penal Code Ann. ' 30.05 (Vernon Supp.
2009).  But here, Officer CarrabyCa police
officer with only one year of law enforcement experienceCwas
notified by dispatch only that a vehicle, deemed suspicious by the caller for a
reason unknown to Officer Carraby, was circling two public parking lots at 8:00
p.m., an act which does not constitute criminal behavior.[4]  See Griffey, 241 S.W.3d at 705
(holding that officer lacked reasonable suspicion based on Whataburger manager=s report
that individual was passed out behind wheel in drive-through line, Awhich
does not constitute criminal behavior@).  The suspicious persons in Bobo were
reported by a  resident of the townhome
complex to be Amilling around some [of the]
townhouses,@ and the court noted the
suspicious persons were in an area Awhere
they should not be@; the suspected criminal
trespass by the suspicious persons in Bobo is conduct inherently more
suspicious than Derichsweiler=s
conduct circling and parking in public parking lots at 8:00 at night.  See Bobo, 843 S.W.2d at 573.








Thus,
unlike in Bobo, this is not a case in which the officer received
information that a citizen informant witnessed criminal behavior.  Compare Bobo, 843 S.W.2d at 575
(townhome resident described two suspicious persons in an area where they
should not be); Brother, 166 S.W.3d at 258 (citizen described defendant=s car
and location, as well as his erratic driving); Pipkin v. State, 114
S.W.3d 649, 654 (Tex. App.CFort
Worth 2003, no pet.) (citizen described defendant driving under speed limit and
smoking a crack pipe); State v. Stolte, 991 S.W.2d 336, 341 (Tex. App.CFort
Worth 1999, no pet.) (unidentified citizen caller described erratic driving and
identified car and location), with Griffey, 241 S.W.3d at 705 (citizen
informant reported that individual was passed out behind wheel in drive-through
line).  Although the possibility of an
innocent explanation for Derichsweiler=s
actions did not deprive Officer Carraby of the ability to reasonably suspect
criminal conduct, the State bore the burden to show that the officer had
reasonable suspicion that Derichsweiler was violating the law.  See Castro v. State, 227 S.W.3d 737,
741 (Tex. Crim. App. 2007); Woods v. State, 956 S.W.2d 33, 38 (Tex.
Crim. App. 1997).  The testimony of
Officer Carraby that driving around the public parking lots of two businesses
at 8:00 p.m. is not normal behavior cannot, without more, support his
reasonable-suspicion determination.








Even
considering as part of the totality of the circumstances the information that
was not relayed to Officer Carraby before Derichsweiler=s
detention but that was presented at trialCthat
Derichsweiler drove up beside the Holdens, grinned at them for about fifteen
seconds, drove around the McDonald=s,
stopped behind them, and grinned again for fifteen to twenty secondsCthese
additional facts do not cause the facts known by Officer Carraby and the
rational inferences from those facts to rise to the level of specific,
articulable facts that Derichsweiler was connected with criminal activity.  See Ford, 158 S.W.3d at 492B93.  The Holdens testified that the only gesture
Derichsweiler made toward them was a grin, that nothing Derichsweiler did could
be described as criminal activity, that he made no obscene or threatening
gestures, and that he was not driving erratically.








The
trial court made a finding of fact that A[a]lthough
no testimony was provided concerning the historic crime rate at the scene, it
is within the realm of general knowledge of a police officer that parking lots
are locations where break ins and thefts occur.@  This finding of fact is not supported by the
record; Officer Carraby testified only that driving around a parking lot at
8:00 at night is not normal behavior; he did not testify as to what crime he
thought Derichsweiler might be committing. 
Because this finding is not supported by the record it is entitled to no
deference.  See, e.g., Garcia
v. State, 919 S.W.2d 370, 379 (Tex. Crim. App. 1994) (refusing to defer to
trial court=s finding not supported by
record on suppression issue).  And this
is not the type of fact subject to judicial notice.  See Tex. R. Evid. 201 (providing that
a judicially noticed fact must be one not subject to reasonable dispute).  Finally, even taking this finding of fact as
true and giving it deference, it provides no additional specific, articulable
facts concerning Derichsweiler=s
conduct.  The finding is not limited in
location, time, or conduct.  Under this
finding, reasonable suspicion exists to stop any and all vehicles circling any
and all public parking lots at any and all times.

Officer
Carraby could have waited until Derichsweiler exited his vehicle to approach
him and initiate a consensual encounter to determine if additional information
existed to corroborate the Holdens=
call.  But, instead, Officer Carraby and
two other officers initiated an investigative detention by Ablocking
in@
Derichsweiler=s vehicle with their patrol
cars, preventing Derichsweiler from leaving the parking spot where he had
parked.  

Because,
based on the totality of the circumstances, the information that Officer
Carraby received from dispatch, coupled with his law enforcement experience,
independent observations, and the rational inferences from all of the
information, did not rise to the level of specific and articulable facts that
Derichsweiler was connected with criminal activity, we sustain Derichsweiler=s first
point.  See Ford, 158 S.W.3d at
492B93.








                                        IV. 
Conclusion

Having
sustained Derichsweiler=s first point, we need not
address his remaining points.  See Tex.
R. App. P. 47.1.  We reverse the trial
court=s
judgment and remand this case to the trial court for further proceedings
consistent with this opinion.

 

SUE WALKER

JUSTICE

 

PANEL:  DAUPHINOT, GARDNER, and
WALKER, JJ.

 

GARDNER, J. filed a dissenting opinion.

 

PUBLISH

 

DELIVERED: November 25, 2009











 
 
 
 
 
 
 




 

 

 

 

 

 

                                      COURT OF APPEALS

                                       SECOND DISTRICT OF TEXAS

                                                   FORT WORTH

 

 

                                       NO.  2-08-117-CR

 

 

MARK DERICHSWEILER                                                        APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 362ND DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                   DISSENTING OPINION

 

                                              ------------








I
respectfully dissent.  The totality of
the circumstances, including Officer Carraby=s training
and experience, the locality, the date, the time of evening, the information
conveyed to him by dispatch, and his independent observations established
reasonable suspicion for Appellant=s
detention for further investigation.  It
was dark at 8:00 p.m. on New Year=s Eve
when Joe and Joanna Holden ordered food from the McDonald=s
restaurant drive-through.  The third time
Appellant parked close to them, Joe felt intimidated and uncomfortable.  At Joanna=s
insistence, Joe called 911.  He
identified himself to the 911 operator, described the vehicle, and recited its
license number.  Joe did not remember
exactly what else he told dispatch but Abasically
there was some suspicious behavior with the vehicle. And, you know, kind [sic]
what they had done.@ 
Meanwhile, Appellant drove to the adjacent Wal-Mart parking lot, where
Joanna observed Appellant Apulling
into parking spots and staying there for about the same amount of time that he
was observing us, and then pulling out and moving into different parking spots,
and kind of closer to the door.@  Joe lost track of the vehicle, and then
police cars arrived Afrom everywhere.@  Before Joe and Joanna left the scene, a
police officer spoke to them, and they gave him their contact information.  On cross-examination, Joe conceded that he
did not see Appellant commit a crime or make threatening gestures toward Joe
and Joanna but described his behavior as Aintimidating.@








Officer
Carraby was a certified peace officer with training and about one year of
experience as a Lewisville police officer at the time of the incident.  He testified that he was familiar with the
area where the McDonald=s and Wal-Mart were located
because it was his regular area of patrol. 
It was common, Officer Carraby said, for him to receive dispatches about
suspicious vehicles or persons.  He
received the dispatch concerning a suspicious vehicle Acircling@ the
Wal-Mart parking lot.  The dispatcher
gave him the vehicle=s description and license number
and identified Joe Holden as the citizen who had reported the vehicle.  Officer Carraby and another officer in a
different patrol car responded to the dispatch and drove to the Wal-Mart
parking lot.  Officer Carraby located and
personally observed Appellant=s
vehicle still driving around and parking in the Wal-Mart lot.

Officer
Carraby testified that dispatch Aadvised
that the complainant caller, Joe Holden, stated that the vehicle was circling
the parking lot, and he believed it to be suspicious.@  Officer Carraby further testified that, based
upon his training and experience and what he had been taught at the academy and
in field training, it is Anot normal@ for
vehicles to drive around parking lots at night. 
He identified the vehicle based on the license plate, make, and model of
the car provided by the Holdens; observed the vehicle being driven around the
parking lot; and detained the vehicle based upon the information dispatch gave
him and his belief that Athere was possible criminal
activity afoot.@

The
trial court denied Appellant=s motion
to suppress.  After trial, the trial
court made findings of fact and conclusions of law regarding Appellant=s
detention, concluding that Officer Carraby Aclearly
had reasonable suspicion to detain the Defendant to investigate his suspicious
behavior and possible involvement in criminal activity@ and
that the case was Aalmost on point@ with Bobo
v. State, 843 S.W.2d 572, 575 (Tex. Crim. App. 1992).








The
majority opinion disagrees with the trial court=s
reliance upon Bobo, reasoning that the officer in that case received
information that a citizen informant had observed Acriminal
behavior.@ 
The majority distinguishes Bobo from the case before us on the
ground that the vehicle here was deemed suspicious merely because it was
circling a parking lot, which is not criminal behavior.  Maj. Op. at p. 15.  I disagree that this is a valid distinction.

It is
well-settled that reasonable suspicion exists when, based on the totality of
the circumstances, the officer has specific, articulable facts that when
combined with rational inferences that may be drawn from those facts, would
lead him to reasonably conclude that a particular person is, has been, or soon will
be engaged in criminal activity.  Curtis
v. State, 238 S.W.3d 376, 380-81 (Tex. Crim. App. 2007) (citing Woods v.
State, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997).  When a detention is based upon conduct by the
suspect, that conduct need not itself be unlawful or in some sense inconsistent
with innocence.  Woods, 956 S.W.2d
at 38 (paraphrasing U.S. v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581,
1585 (1989)).








A[I]nnocent
behavior will frequently provide the basis for a showing of probable cause.@  Id. at 38.  Where innocent behavior is the basis for a
determination of reasonable suspicion, the relevant inquiry Ais not
whether particular conduct is innocent or criminal, but the degree of suspicion
that attaches to particular types of noncriminal acts.@  Id. at 38. 
The reasonableness of the suspicion must be determined by the Atotality
of the circumstances.@  Sokolow, 490 U.S. at 8, 109 S. Ct. at 1585B86; see
Vafaiyan v. State, 279 S.W.3d 374, 379B80 (Tex.
App.CFort
Worth 2008, pet. ref=d) (holding purchases of small
amounts of cold medicine containing Sudafed formed sufficient basis for
reasonable suspicion in light of totality of circumstances).








Additionally,
contrary to the majority opinion=s
characterization of Bobo=s
holding, the court of criminal appeals never said in that case that the two
suspicious persons milling around the townhouses were engaged in criminal
activity.  The most that the opinion in
Bobo says is that they were observed Ain an
area where they should not be.@  Bobo, 843 S.W.2d at 575.  Moreover, the court in Bobo did not
hold that reasonable suspicion for temporary detention was created by the
report of that conduct.  Instead, the
court of criminal appeals looked to all of the surrounding circumstances and
held that the officer=s fifteen years of law
enforcement experience, seeing the individuals leaving the area who matched the
descriptions of the suspicious persons, as well as the report of the citizen
identifying them as suspicious persons around several homes, and the
observation of appellantCwho matched the description in
the report, provided the officer with a reasonable, articulable basis to
conclude that further investigation was necessary.  Id.; Kendrick v. State, 93 S.W.3d 230,
237 (Tex. App.CHouston [14th Dist.] 2002, pet.
ref=d)
(relevant inquiry not whether conduct is criminal or civil but the degree of
suspicion that attaches to particular types of noncriminal acts); Sargent v.
State, 56 S.W.3d 720, 724 (Tex. App.CHouston
[14th Dist.] 2001, pet. ref=d)
(multiple calls from pay phone, innocent standing alone, justified detention
where coupled with visits to trailer known for heroin sales and failure to
identify ); Jackson v. State, No. 05-99-00361-CR, 2001 WL 8867, at *3
(Tex. App.CDallas 2001, no pet.) (gesture
as if to hide something in defendant=s pants,
although seemingly innocent, sufficient to justify detention coupled with
initial attempt to leave scene and experience of officer, citing Bobo,
843 S.W.2d at 575).













A
citizen=s
suspicious person report can be enough to support an officer=s
reasonable suspicion for a detention, provided the facts are adequately
corroborated by the officer.[1]  Brother v. State, 166 S.W.3d 255, 258B59 (Tex.
Crim. App. 2005).  Information from a
citizen who has actually witnessed a criminal event is considered inherently
reliable and will support a temporary detention if sufficiently
corroborated.  Hime v. State, 998
S.W.2d 893, 895 (Tex. App.CHouston
[14th Dist.] 1999, pet. ref=d). The
informant=s willingness to be held
accountable further enhances his reliability. 
Id;  Reesing v. State, 140
S.W.3d 732, 736 (Tex. App.CAustin
2004, pet. ref=d).  But citizen-informant tips of behavior that
is merely suspicious and consistent with criminal activity may also be used to
establish reasonable suspicion for a temporary detention.  Bobo, 843 S.W.2d at 575 (report by
citizen sufficient that identified suspicious persons around several homes
where they should not be, leaving in an automobile, and officer=s
fifteen years= experience); State v. Fudge,
42 S.W.3d 226, 230 (Tex. App.CAustin
2001, pet. ref=d) (upholding stop based on
face-to-face report pointing out driver of vehicle and stating that he Acould
not stay on the road@); see also Soto v. State, No.
09-07-00336-CR, 2008 WL 4936844, at *2 (Tex. App.CBeaumont
Nov. 12, 2008, no pet.) (mem. op., not designated for publication) (911 call
reporting unidentified vehicle parked in driveway, although caller did not know
what driver was doing, what he intended, or what he had done, reasonably
supported investigative stop); Santa Cruz v. State, No. 04-01-00762-CR,
2002 WL 31465799, at *1B2 (Tex. App.CSan
Antonio Nov. 6, 2002, no pet.) (not designated for publication) (holding
officer had reasonable suspicion to stop defendant based on call about a Asuspicious
vehicle@
matching defendant=s vehicle and statement from
unknown woman who appeared frightened, that Athe car
he was looking for was behind him@).








The
majority cites State v. Griffey, 241 S.W.3d 700, 704 (Tex. App.CAustin
2007, pet. ref=d), as holding that an officer
lacked reasonable suspicion based upon a restaurant manager=s report
that a woman was passed out behind the wheel in the drive-through line, Awhich
does not constitute criminal behavior.@  Maj. Op. at p.14B15
(quoting from Griffey, 241 S.W.3d at 705).  However, that the conduct described in the
report was not criminal was not the basis for the court=s
holding that the officer lacked reasonable suspicion.  Instead, the Austin court of appeals
concluded that the report, standing alone, was insufficient to establish
reasonable suspicion because there was no corroboration of it and, instead, the
responding officer found the woman awake, directly contradicting the
information in the report.[2]  Griffey, 241 S.W.3d at 704.  Unlike the report in Griffey, the
information provided by the dispatcher here was consistent with, corroborated,
and confirmed by what Officer Carraby observed upon his arrival at the sceneCAppellant
was still driving around the Wal-Mart parking lot and the license plate, make,
and model of the vehicle matched the description given by Joe Holden.








I agree
with the trial court that Bobo is on point, and that case supports the
trial court=s reasonable suspicion
determination in this case.  Joe Holden=s 911
call about Appellant=s Asuspicious@
behavior in driving or circling around the parking lot is like the Asuspicious
persons@ call in
Bobo about the individuals milling around the townhouses.[3]  See Bobo, 843 S.W.2d at 573.  As in Bobo, Officer Carraby was able
to identify Appellant=s vehicle based on the
information provided by the citizen-informant. 
See id.  In addition, upon
his arrival at the scene, Officer Carraby independently observed the exact
behavior by Appellant that had been reported by Holden, circling the Wal-Mart
parking lot, which in Officer Carraby=s
experience was not normal.  And this
behavior was occurring around 8:00 p.m., after dark on New Year=s Eve, a
night when it is unlikely that the stores remained open for business but not
unlikely that a driver might have consumed an excessive amount of alcohol.  The only salient difference between the
detention in Bobo and the one in this case is that the detaining officer
in Bobo had fifteen years=
experienceCa factor cited by the court of
criminal appealsCand Officer Carraby had just one
year of experience.  See id. at
575.  I cannot see how the difference in
the officers= experience compels a different
outcome, particularly in light of the fact that this Wal-Mart parking lot was
part of Officer Carraby=s regular patrol, and the
officer in each case testified that his law-enforcement experience played a
role in forming his suspicion that crime was afoot.

Viewing the evidence in the light most favorable
to the trial court=s ruling, I would hold
that, examining the totality of the circumstances, Officer Carraby had specific
articulable facts, which taken together with the rational inferences that could
be drawn from those facts, provided reasonable suspicion that Appellant was,
had been, or soon would be, engaged in criminal activity, to-wit:  driving while under the influence of alcohol.  I would hold that the trial court did not err
by concluding that Officer Carraby had reasonable suspicion to justify
Appellant=s detention and by
overruling the motion to suppress, and would proceed to consider Appellant=s remaining points.  Because the majority holds otherwise, I
dissent. 

 

 

ANNE GARDNER

JUSTICE








 

PUBLISH

 

DELIVERED: November 25, 2009











[1]We utilize the terms Astop@ and Adetention@ or Ainvestigative detention@ jointly and
interchangeably herein.  See Terry
v. Ohio, 392 U.S. 1, 10, 88 S. Ct. 1868, 1874 (1968).





[2]We may consider both the
suppression-hearing and trial testimony because Derichsweiler raised the
suppression issue before the jury, beginning with his opening statement and
continuing with his cross-examination of Officer Carraby.  See Rachal, 917 S.W.2d at 799.





[3]At the suppression
hearing, Officer Carraby testified about the call he received from
dispatch:  

 

I don=t remember from memory,
but based on the document that I=m reading, it was a suspicious subject phone
call.  The witness advised that they saw
a small gray car.  They gave the license
plate number as Texas license plate number . . . 971 MPM, circling the parking
lot of Wal-Mart and McDonald=s.  The
complainant thought that the vehicle was suspicious and wanted us to check it
out.

 

Officer
Carraby=s testimony during trial
was consistent with his testimony at the suppression hearing regarding the
dispatch call.  He explained at trial
that dispatch told him that A[t]here was a suspicious male driving around in a
small gray car with a license plate of 971-MPM, driving around the parking lot
of McDonald=s and Wal-Mart.@





[4]The dissent argues that Ait is unlikely@ that Wal-Mart was open
that night because it was 8:00 p.m. on New Year=s Eve.  The record demonstrates that McDonald=s was open for business
that night and that the Wal-Mart parking lot had several vehicles parked in it
because Derichsweiler was reportedly pulling up next to other vehicles in the
Wal-Mart lot.  Apparently, Wal-Mart was
open for business or just closing.  In
any event, the evidence establishes that the parking lots was public places.





[1]There is no issue here as to anonymity of the tipster as in State
v. Jennings, 958 S.W.2d 930, 933B34 (Tex. App.CAmarillo 1997, no pet.), cited by the
majority.  Nor is there any question
whether the facts were adequately corroborated. 
The caller relayed to the dispatcher the suspicious vehicle=s movements in the
parking lot, provided the make, model, and license number of the vehicle, and
made himself accountable by providing his identity and contact information and
remaining at the scene until the officers arrived.  See Brother, 166 S.W.3d at 259;
Pipkin v. State, 114 S.W.3d 649, 654 (Tex. App.CFort Worth 2003, no
pet.).





[2]The court in Griffey cited Cornejo v. State, 917 S.W.2d
480 (Tex. App.CHouston [14th Dist.]
1996, pet. ref=d) as an example of the
most reliable form of citizen-informant tip, information given by victims of a
drive-by shooting that gang members had fired at them.  Griffey, 241 S.W.3d at 704B05.  But the information in Cornejo was not
given as a citizen-informant tip; rather, it was given as statements by the
victims after the police arrived on the scene; and the issue was not reasonable
suspicion to detain the alleged driver-shooter but probable cause for a
warrantless arrest.  Cornejo, 917
S.W.2d at 483.  Neither Griffey
nor Cornejo stands for the proposition that citizen-informant tips will
only support reasonable suspicion for detention if the conduct they report is
criminal activity.





[3]There is no evidence in the record that the Wal-Mart and adjacent Sam=s Club were open for
business at 8:00 p.m. on that New Year=s eve.